UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

                                  Plaintiff,

           v.

SUFFOLK LAUNDRY SERVICES, INC.,

                              Defendant.

--------------------------------------------------------------

MARLYN GONZALEZ, ROSA GUEVARA-
MARTINEZ, MARINA VILORIO, XIOMARA
VELIZ-AMAYA, MIRIAN VELASQUEZ,
AZUCENA CASTILLO, and MARIA DEL
CARMEN AMAYA,

                          Intervenor-Plaintiffs,

           v.

SUFFOLK LAUNDRY SERVICES, INC.,
WALTER SULLIVAN II and CATHY
SULLIVAN,

                              Defendants.

--------------------------------------------------------------

**MEMORANDUM & ORDER**
12-CV-409 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), commenced the

above-captioned action on January 30, 2012, against Suffolk Laundry Services, Inc. ("Suffolk

Laundry") alleging, *inter alia*, sexual harassment and a hostile work environment and seeking

relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended,

("Title VII"). (Docket Entry No. 1.)  On February 2, 2012, Intervenor-Plaintiffs, Marlyn

Gonzalez, Rosa Guevara-Martinez, Marina Vilorio, Xiomara Veliz-Amaya, Mirian Velasquez,

Azucena Castillo and Maria del Carmen Amaya, moved to intervene in this action pursuant to Rule 24(a) of the Federal Rules of Civil Procedure.[1]  (Docket Entry No. 5.)  On March 9, 2012, Judge Sandra J. Feuerstein granted the Intervenor-Plaintiffs' motion to intervene.[2]  (Docket Entry No. 12.)  Intervenor-Plaintiffs filed an Intervenor Complaint on March 12, 2012, adding state law claims pursuant to the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*. ("NYSHRL"), and alleging Title VII claims of sexual harassment and retaliation against Defendant Suffolk Laundry, and claims of discrimination and retaliation against Suffolk Laundry, Walter Sullivan II and Cathy Sullivan.  (Docket Entry No. 13.)

Currently before the Court are Defendants' motion for partial summary judgment as to (1) the hostile work environment claims alleged by Guevara-Martinez, Vilorio, Veliz-Amaya, Velasquez, Castillo and Amaya and (2) the retaliation claims by Gonzalez, Guevara-Martinez, Vilorio, Veliz-Amaya, Castillo, Amaya and Edith Cruz.[3]  (Docket Entry No. 39.)  Defendants also move for summary judgment as to all claims against Walter Sullivan II and Cathy Sullivan (collectively, the "Sullivans") arguing that they cannot be held personally liable for the hostile work environment claims alleged in the Intervenor Complaint.  For the reasons discussed below, Defendants' motion for partial summary judgment as to the hostile work environment claim is

---

[1]  The EEOC Complaint named Gonzalez, Guevara-Martinez, Vilorio, Veliz-Amaya, Velasquez, Castillo and Amaya as "Charging Parties," and brought the action on behalf of the Charging Parties "and a class of similarly situated female laundry workers," referring to the Charging Parties and the other class members as "Claimants."  (Compl. at 1.)

[2]  This case was transferred to the undersigned on March 23, 2012.

[3]  Edith Cruz did not file an EEOC charge and is not one of the Intervenor-Plaintiffs.  The EEOC is pursuing a claim of harassment and retaliation on behalf of Edith Cruz.  (Def. 56.1 ¶ 227; Pl. 56.1 ¶ 227.)

denied.  The Court will issue a separate ruling on Defendants' motion for summary judgment as to the retaliation claims.

## I.  Background

### a.  Suffolk Laundry

The Sullivans own Suffolk Laundry, (Joint Pre-Trial Order ("JPTO") ¶ 7, Docket Entry No. 34), a commercial laundry business that provides laundry services for hospitals, nursing homes and restaurants, (Def. 56.1 ¶¶ 1–2; Pl. 56.1 ¶¶ 1–2).  Suffolk Laundry employs approximately 75 employees, in addition to the Intervenor-Plaintiffs.  (Def. 56.1 ¶ 5; Pl. 56.1 ¶ 5.)  Walter Sullivan II ("Walter Sullivan") is the President of Suffolk Laundry, and Cathy Sullivan is the Corporate Secretary.  (Def. 56.1 ¶¶ 3, 7; Pl. 56.1 ¶¶ 3, 7.)  Their son, Walter Sullivan III ("Sullivan III") also works at Suffolk Laundry.  (Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10.)  He "takes care of the linen routes, does packing and is a back-up driver."[4]  (*Id.*)

Suffolk Laundry hired Rajindra Singh in 2003 as a mechanic.  (Def. 56.1 ¶ 35; Pl. 56.1 ¶ 35.)  At all times during his employment at Suffolk Laundry, Singh reported to Walter Sullivan.  (Def. 56.1 ¶ 36; Pl. ¶ 36.)  In or about May 2010, Singh was promoted to Plant Manager, (Def. 56.1 ¶ 38, Pl. ¶ 38), and is currently still employed at Suffolk Laundry,  (JPTO ¶ 13).  The parties dispute whether Singh had supervisory responsibilities at Suffolk Laundry.  (*See* Pl. 56.1 ¶ 4.)  EEOC claims that Singh "had the power to influence the firing of employees, make recommendations about employees' work performance, issue disciplinary warnings, and control employees' hours, including overtime hours."  (Pl. 56.1 ¶¶ 4, 6, 28.)  According to Defendants, Walter Sullivan is in charge of hiring, firing and employees' hours, and managers

---

[4]  Plaintiffs allege that Sullivan III had managerial responsibilities as well, and could "influence the firing of employees."  (Pl. 56.1 ¶ 4.)

like Singh may only discipline employees with Walter Sullivan's permission.  (Def. 56.1 ¶ 4.)

Rigoberto Cardona, known as "Fito," works in maintenance at Suffolk Laundry, and reports to

Singh.  (*Id*. ¶ 39; Pl. 56.1 ¶ 39.)  Cardona occasionally translates for the Spanish-speaking

employees.  (Pl. 56.1 ¶¶ 131, 183.)

Female and male employees at Suffolk Laundry work in different areas.  (Def. 56.1 ¶ 17;

Pl. 56.1 ¶ 17.)  Employees at Suffolk Laundry learned about their assigned work station one day

in advance by reviewing a daily schedule, (Def. 56.1 ¶ 20; Pl. 56.1 ¶ 20), which EEOC asserts

was created and managed by Singh, (Pl. 56.1 ¶ 20).  Some machines are easier to work than

others, although there is no universal consensus amongst the employees as to which machines

are the best or easiest machines to work.  (Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19.)  EEOC contends that the

different work station assignments in the main work areas, "flatwork" and "finishing," vary in

difficulty.  (Pl. 56.1 ¶ 18.)   The parties dispute whether employees at Suffolk Laundry received

training on how to perform their job assignments.  (Def. 56.1 ¶ 22; Pl. 56.1 ¶ 22.)

### b.  Alleged harassment

On or about January 19, 2011, each of the Intervenor-Plaintiffs filed charges of

discrimination ("EEOC charge") against Suffolk Laundry with the EEOC.  (Def. 56.1 ¶ 49; Pl.

56.1 ¶ 49.)  The EEOC charges allege misconduct by Singh against female employees at Suffolk

Laundry.[5]  Intervenor-Plaintiffs Marlyn Gonzalez and Mirian Velasquez filed amended charges

against Suffolk Laundry on or about July 13, 2011, and March 23, 2011, respectively, alleging

retaliation.  (Def. 56.1 ¶ 49; Pl. 56. 1 ¶ 49.)  The Intervenor-Plaintiffs claim that they were not

aware of any policy at Suffolk Laundry addressing sexual harassment.  (Pl. 56.1 ¶ 13.)

---

[5]  (*See* Sur-Reply Declaration of Adela Santos ("Santos Sur-Reply Decl.") Exs. 1–7,
Docket Entry No. 55.)

###### i. Marina Vilorio

Vilorio was employed at Suffolk Laundry from 2006 until April or May 2011.[6] (Def. 56.1 ¶ 51; Pl. 56.1 ¶ 51.)  According to Vilorio, she was discriminated against due to her gender and subjected to sexual comments by Singh.  (Def. 56.1 ¶¶ 52–53, Pl. 56.1 ¶¶ 52–53.)  Vilorio was subjected to unwanted touching by Singh, and was "afraid to complain about [Singh's conduct] for fear of losing hours on the job."  (Vilorio EEOC Charge dated December 20, 2010, annexed to Santos Sur. Reply Decl. as Ex. 4 ¶¶ 7, 9.)

After Singh became Plant Manager, he touched Vilorio several times on the shoulder. (Def. 56.1 ¶ 55; Pl. 56.1 ¶ 55.)  Singh "pass[ed] his hand on her shoulder as a caress."  (Def. 56.1 ¶ 55; Pl. 56.1 ¶ 55.)  Singh continued to touch Vilorio, despite her "repeated" requests that he stop the unwanted touching and "mock[ed] her each time [by] saying 'oh, I forget, you don't like it.'"  (Pl. 56.1 ¶ 55.)  Singh touched Vilorio's face "on several occasions and also touched her waist on several occasions." (Pl. 56.1 ¶ 56.)  Vilorio told "Sister Margarita"[7] that Singh had been touching her and other co-workers. (Pl. 56.1 ¶ 58.)  Singh also asked Vilorio for a kiss in Spanish, (Def. 56.1 ¶ 59; Pl. 56.1 ¶ 59), and asked her for a kiss on several occasions, possibly more than five times, (Pl. 56.1 ¶ 59).  Defendants contend that Vilorio never told anyone about Singh touching her.  (Def. 56.1 ¶ 58.)

Vilorio either observed or learned of Singh's conduct towards two other female employees at Suffolk Laundry.  Vilorio saw Singh touch Castillo and Gonzalez at the tablecloth

---

[6] Defendants allege that Vilorio was employed by Suffolk Laundry "through April 2011."  (Def. 56.1 ¶ 51.)  According to Vilorio, her last day of employment was May 25, 2011. (Pl. 56.1 ¶ 51.)

[7] Plaintiffs refer to an individual named "Sister Margarita" in their 56.1 statement of undisputed facts as an individual from whom Vilorio and Azucena Castillo sought assistance, (*see* Pl. 56.1 ¶¶ 58, 64, 91), but there are no additional facts about this individual.

machine. (Def. 56.1 ¶ 63; Pl. 56.1 ¶ 63.) Castillo told Vilorio that when she went to Singh's office to ask permission to go to the doctor, he agreed to grant her permission if she sat on his legs. (Def. 56.1 ¶ 60; Pl. 56.1 ¶ 60.) Gonzalez told Vilorio once that Singh touched her shoulder and waist and had given her a note, or multiple notes, though Gonzalez did not tell Vilorio the contents of the note or notes. (Def. 56.1 ¶ 62; Pl. 56.1 ¶ 62.)

When Vilorio first started working at Suffolk Laundry, her job assignment was to "feed" napkins into one of the machines with four other employees.[8] (Def. 56.1 ¶ 54; Pl. 56.1 ¶ 54.) She did not believe that this job was difficult and this was the only responsibility at the laundry that Vilorio felt was not difficult. (Def. 56.1 ¶ 54; Pl. 56.1 ¶ 54.) Prior to filing a claim with the EEOC, Vilorio was assigned to feed napkins and tablecloths and to fold napkins. (Pl. 56.1 ¶ 65.) After she filed the EEOC charge, Singh assigned Vilorio to "practically all of the work stations in the laundry." (*Id*.) In addition to her previous assignments, Singh assigned her to "feed sheets, fold shirts, feed diapers, fold blankets," which she found difficult. (*Id*.) Singh insisted on higher production from Vilorio than from other co-workers. (*Id*. ¶ 70.) According to Vilorio, Singh also increased the speed of the tablecloth machine and sheet machine, although, "it did not affect the machine if she did not feed it quickly enough," even with the increased speed. (Def. 56.1 ¶ 71; Pl. 56.1 ¶ 71.) Singh would get upset if Vilorio did not increase her speed. (Pl. 56.1 ¶ 71.) The Defendants dispute Vilorio's allegations as to the nature of Vilorio's work prior to her filing the EEOC charge and after she filed a charge. According to Defendants, Vilorio testified during her deposition that prior to filing the EEOC charge, she was responsible for feeding

---

[8] The parties appear to use the term "feed" to refer to the process of putting articles of clothing into a machine for processing by the machine.

napkins but after the filing of the EEOC charge, she would "feed sheets, fold shirts, feed diapers and towels, fold blankets, feed tablecloths and fold aprons." (Def. 56.1 ¶ 65.)

Vilorio also alleges that after she filed the EEOC charge, her hours were reduced and she worked "notably fewer overtime hours." (Pl. 56.1 ¶ 74.) She worked less overtime in 2011 than in 2010 and she received less overtime than 17 of the 29 employees employed at Suffolk Laundry. (*Id.* ¶ 75.) Vilorio quit her job because she could no longer tolerate working at Suffolk Laundry. (*Id.* ¶ 78.) Defendants claim that the pay records demonstrate that Vilorio did receive overtime hours, noting that "[i]n the nine bi-weekly pay periods from February 3, 2011 until she quit her employment, [Vilorio] received overtime in every bi-weekly pay period except one" and in her last two weeks at Suffolk Laundry, Vilorio received 22.5 hours of overtime. (Def. 56.1 ¶ 74.) Defendants claim that Vilorio quit working at Suffolk Laundry because she moved from Riverhead to Brentwood to be with her boyfriend. (*Id.* ¶ 78.)

### ii. Azucena Castillo

Castillo worked at Suffolk Laundry between 2008 and 2011. (Def. 56.1 ¶ 80; Pl. 56.1 ¶ 80.) Castillo alleges that she was discriminated against based on her gender and subjected to inappropriate comments and unwanted touching by Singh. (Def. 56.1 ¶ 83; Pl. 56.1 ¶ 83.) Castillo was "afraid to complain about [Singh's conduct] for fear of losing hours on the job or other retaliation." (Pl. Sur-Reply Ex. 2 ¶ 10.)

On one occasion after Singh became Plant Manager, when Castillo asked Singh if she could go home because she was not feeling well, Singh responded by gesturing to her, indicating that he wanted her to sit on his legs. (Def. 56.1 ¶ 87; Pl. 56.1 ¶ 87.) Castillo refused. (Def. 56.1 ¶ 87; Pl. 56.1 ¶ 87.) Singh also told Castillo that he would allow her to go home if she let him place his ear on her chest. (Pl. 56.1 ¶ 87.) Singh eventually allowed Castillo to go home early.

(Def. 56.1 ¶ 87; Pl. 56.1 ¶ 87.)  On another occasion, Singh asked Castillo for a kiss.  (Def. 56.1 ¶ 88; Pl. 56.1 ¶ 88.)  On a separate occasion, Singh touched Castillo on the hip and pulled up her pants.  (Def. 56.1 ¶ 89; Pl. 56.1 ¶ 89.)  Singh touched Castillo's chin several times, and touched her on her waist.  (Pl. 56.1 ¶ 363.)  Castillo sought help from Sister Margarita about Singh's conduct.  (Pl. 56.1 ¶ 91.)  Veliz-Amaya saw Singh touch Castillo's back and lower his hand to her buttocks several times and noticed that Castillo would get upset when Singh touched her.  (Pl. 56.1 ¶ 366.)  According to Defendants, Castillo did not complain to anyone at Suffolk Laundry about Singh's behavior.  (Def. 56.1 ¶ 91.)

Castillo observed Singh's conduct towards other female employees at Suffolk Laundry.  She saw Singh touch Gonzalez and Vilorio.  (Def. 56.1 ¶ 92; Pl. 56.1 ¶ 92.)  Gonzalez also told Castillo that Singh was giving her notes indicating that "he wanted to make love to her, have oral sex with her and that she should go out with him."  (Def. 56.1 ¶ 94; Pl. 56.1 ¶ 94.)

When Castillo began working at Suffolk Laundry, she was responsible for putting hospital robes and restaurant napkins in a machine for ironing.  (Def. 56.1 ¶ 82; Pl. 56.1 ¶ 82.)  Castillo was shown how to do this work by other employees and believed it to be a physically challenging job, but less challenging once she learned how to do it.  (Def. 56.1 ¶ 82; Pl. 56.1 ¶ 82.)  When Singh became Plant Manager, he moved Castillo to the machine that folded hospital sheets and restaurant tablecloths.  (Def. 56.1 ¶ 86; Pl. 56.1 ¶ 86.)  This machine required more effort but once she learned how to use the machine, this job became easier.  (Def. 56.1 ¶ 86; Pl. 56.1 ¶ 86.)

After Castillo filed her EEOC charge, Singh moved her to work on other machines.  (Def. 56.1 ¶ 95; Pl. 56.1 ¶ 95.)  Her "last 19 assignments show that in her last few weeks of employment with Defendants . . . she was assigned to five different positions . . . and was never

scheduled more than two days in a row at any one station." (Pl. 56.1 ¶ 95.) Unlike her assignments prior to when she filed her EEOC charge, Castillo was not trained on how to perform these new tasks despite her requests. (*Id.*) After the EEOC charge was filed, Castillo's hours were reduced. (Def. 56.1 ¶ 101; Pl. 56.1 ¶ 101.) Castillo was asked to meet with the Sullivans at their home regarding her EEOC charge. (Def. 56.1 ¶ 107; Pl. 56.1 ¶ 107.) The Sullivans told Castillo that "if she did not like her job, she should find another because they would not prefer her over Singh." (Pl. 56.1 ¶ 84.) Castillo left Suffolk Laundry in 2011 when she became pregnant. (Def. 56.1 ¶ 108; Pl 56.1 ¶ 108.)

### iii. Maria del Carmen Amaya

Amaya started working at Suffolk Laundry in 2007. (Def. 56.1 ¶ 110; Pl. 56.1 ¶ 110.) Singh began touching Amaya from the day she started working at Suffolk Laundry. (Def. 56.1 ¶ 117; Pl. 56.1 ¶ 117.) Singh touched her on the back of her neck and the side of her shoulder every time he passed by her work station. (Def. 56.1 ¶ 118; Pl. 56.1 ¶ 118.) Amaya never said anything to him because she was afraid that he would take work away from her. (Amaya Dep. 42:12–16.) When Amaya sustained a work injury on July 12, 2010, and injured her finger, Singh insisted that she keep working. (Def. 56.1 ¶ 120; Pl. 56.1 ¶ 120.) Days after this work injury, Singh called her stupid and questioned why she missed a day of work, referring to a day when Amaya did not go to work because she had a medical consultation at a clinic for her finger. (Def. 56.1 ¶ 122; Pl. 56.1 ¶ 122.) After Amaya's work injury, Singh reduced her work schedule and when Amaya requested additional days for work, Singh told her to sit on his lap if she wanted an increased work schedule. (Def. 56.1 ¶ 123; Pl. 56.1 ¶ 123.) Amaya also saw Singh touch Castillo. (Def. 56.1 ¶¶ 126–27; Pl. 56.1 ¶¶ 126–27.)

When Amaya first started working at Suffolk Laundry, she was responsible for feeding restaurant napkins into a machine. (Def. 56.1 ¶ 112; Pl. 56.1 ¶ 112.) When Singh became Plant Manager, he moved her to the machine that fed diapers. (Def. 56.1 ¶ 113; Pl. 56.1 ¶ 113.) After the Charges were filed, Amaya was asked to go to the Sullivans' house. (Def. 56.1 ¶ 131; Pl. 56.1 ¶ 131.) Walter Sullivan told Amaya that if "something would happen, we should tell him and not anyone else," and that they "were trying to do a good job so that . . . we will feel good about it, and if something happened, that we should tell him." (Amaya Dep. 73:22–74:20.) When Amaya explained that Singh had asked her to sit on his legs, and asked Walter Sullivan whether he was aware of what Singh was doing, Cardona refused to translate, telling her that "it was not true . . . it was a lie." (*Id.* at 75:14–77:25.) When Amaya asked Cardona why he was refusing to translate what she was saying, he responded "I don't want to say anything." (*Id.* at 78:5–9.) According to Cardona, Amaya did not say anything to him other than that she wanted a different translator. (Cardona Dep. 43:21–23.) When Cardona informed Walter Sullivan of this, Walter Sullivan did not respond. (*Id.* at 44:2–6.)

### iv. Mirian Velasquez

Velasquez began working at Suffolk Laundry on July 25, 2009. (Def. 56.1 ¶ 136; Pl. 56.1 ¶ 136.) On or about March 23, 2011, Velasquez filed an amended charge of discrimination with the EEOC alleging that she was retaliated against for filing her initial charge when the Sullivans required her to speak with them about the charges. (Def. 56.1 ¶ 152; Pl 56.1 ¶ 152.)

Before Singh became Plant Manager, he never touched Velasquez. (Def. 56.1 ¶ 154; Pl. 56.1 ¶ 154.) After he became Plant Manager, Singh touched Velasquez's shoulder. (Def. 56.1 ¶ 155; Pl. 56.1 ¶ 155.) He touched her shoulder at least three times while she worked. (Pl. 56.1 ¶ 155.) On at least two occasions, Singh looked at Velasquez "head to toe and said, 'Very

good,'" in English.  (Def. 56.1 ¶ 158; Pl. 56.1 ¶ 158.)  Velasquez also saw Singh gesture to Rosa

Martinez while saying "No good."  (Def. 56.1 ¶ 158; Pl. 56.1 ¶ 158.)  Velasquez saw Singh

touch Martinez, Gonzalez, Amaya and two non-parties, "Esmeralda" and Dina Monroy.  (Def.

56.1 ¶ 159; Pl. 56.1 ¶ 159.)  Velasquez also saw Singh give gifts to Gonzalez.  (Def. 56.1 ¶ 160;

Pl. 56.1 ¶ 160.)  Velasquez overheard Singh request a kiss from a non-party, in exchange for him

repairing a machine.  (Pl. 56.1 ¶ 157.)

After the EEOC charges were filed, the speed on the machines for tablecloths,

pillowcases, uniforms and large tablecloths was changed.  (Def. 56.1 ¶ 164; Pl. 56.1 ¶ 164.)

Velasquez met with the Sullivans on February 15, 2011 about the EEOC charges.  (Def. 56.1

¶ 165; Pl. 56.1 ¶ 165.)  After this meeting, Velasquez's hours were reduced.  (Def. 56.1 ¶ 166; Pl.

56.1 ¶ 166.)  Velasquez's employment at Suffolk Laundry was terminated on February 23, 2011,

(Def. 56.1 ¶ 167; Pl. 56.1 ¶ 167), weeks after the EEOC charges were filed, (Pl. 56.1 ¶ 595).

### v.  Rosa Guevara Martinez

Martinez started working at Suffolk Laundry on August 9, 2009.  (Def. 56.1 ¶ 169; Pl.

56.1 ¶ 169.)  Martinez alleges that she was discriminated against on the basis of her gender,

subjected to inappropriate comments and unwanted touching by Singh, and was terminated in

retaliation for not submitting to Singh's advances.  (Def. 56.1 ¶ 176; Pl. 56.1 ¶ 176.)

After Singh became Plant Manager, he touched her hand, back, face and buttocks.  (Def.

56.1 ¶ 177; Pl. 56.1 ¶ 177.)  On one occasion, Singh told Martinez that she had a "nice rear" in

English.  (Def. 56.1 ¶ 182; Pl. 56.1 ¶ 182.)  In or about August or September 2010, when

Martinez went to Singh's office to report that a machine was not working, Singh responded that

he would fix the machine if Martinez sat on his legs.  (Def. 56.1 ¶ 183; Pl. 56.1 ¶ 183.)  Singh

also told Martinez that he was better than her boyfriend and that she was "in [his] heart.  (Def.

56.1 ¶ 183; Pl. 56.1 ¶ 183.)  Singh touched Martinez's face and told her she was pretty.  (Pl. 56.1 ¶ 371.)  Singh made inappropriate gestures to Martinez, at one point "he signaled or pointed to his penis indicating that it was swollen and big," and on another occasion, he "blasted the air hose at his penis and laughed."  (Def. 56.1 ¶¶ 184 –85; Pl. 56.1 ¶¶ 184 –85.)  Martinez observed Singh touch Gonzalez on the back and waist, and saw Singh touch Vilorio.  (Def. 56.1 ¶ 187– 188; Pl. 56.1 ¶ 187–88.)  Martinez saw Singh pull up Castillo's pants.  (Def. 56.1 ¶¶ 189; Pl. 56.1 ¶¶ 189.)

When Martinez first started working at Suffolk Laundry, her job was feeding sheets, feeding and folding blankets, and feeding diapers on Sundays.  (Def. 56.1 ¶ 170; Pl. 56.1 ¶ 170.)  When Singh became Plant Manager, Singh rotated Martinez between different jobs and took her off the machine feeding sheets, assigning her to feeding tablecloths, feeding towels and receiving sheets.  (Def. 56.1 ¶ 172; Pl. 56.1 ¶ 172.)  Martinez was terminated from Suffolk Laundry in September 2010.  (Def. 56.1 ¶ 190; Pl. 56.1 ¶ 190.)  According to EEOC, Singh "got [Martinez] fired for refusing his sexual advances."  (Pl. Mem. of Law in Opp. to Def. Mot. for Summary Judgment ("Pl. Opp."), Docket Entry No. 46.)  Defendants claim that Martinez was fired for drinking on the Suffolk Laundry premises.  (Def. 56.1 ¶ 190.)

### vi.  Xiomara Veliz-Amaya

Veliz-Amaya started working at Suffolk Laundry in February 2004.  (Def. 56.1 ¶ 199; Pl. 56.1 ¶ 199.)  She alleges that was discriminated against on the basis of her gender, she was subjected to sexual harassment by Singh, and she was retaliated against when she was called to the Sullivans' home regarding her EEOC charge. (Def. 56.1 ¶ 206; Pl. 56.1 ¶ 206.)

When Singh became Plant Manager, he started getting "too close" to Veliz-Amaya.  (Def. 56.1 ¶ 208; Pl. 56.1 ¶ 208.)  Singh told Veliz-Amaya that she was pretty, asked her out on dates,

and "looked at her intimate parts." (Def. 56.1 ¶¶ 209–210; Pl. 56.1 ¶ 210.) On one occasion, Veliz-Amaya observed Singh lick his lips while she believed he was looking at her bosom. (Def. 56.1 ¶ 211; Pl. 56.1 ¶ 211.) On another occasion, Singh touched her buttocks, though it may have been by accident. (Def. 56.1 ¶ 212; Pl. 56.1 ¶ 212.) On another date, Veliz-Amaya asked Singh if she could go home early because she was not feeling well and Singh asked whether she was pregnant, and denied her request. (Def. 56.1 ¶ 214; Pl. 56.1 ¶ 214.)

Veliz-Amaya also observed Singh touch other female employees. She observed him touch Vilorio on the shoulders and buttocks. (Def. 56.1 ¶¶ 217, 222; Pl. 56.1 ¶¶ 217, 222.) She also observed Singh touch Castillo "many times on the back, and then lowered his hand to the buttocks." (Def. 56.1 ¶¶ 219, 221; Pl. 56.1 ¶¶ 219, 221.) And, she observed Singh touch Judith on her back, hip or waist and Ana several times on the waist and buttocks. (Def. 56.1 ¶ 222; Pl. 56.1 ¶ 222.) According to Veliz-Amaya, Vilorio told her that Singh touched her shoulders and buttocks. (Pl. 56.1 ¶ 215.) Castillo told Veliz-Amaya that Singh had asked to put his head on her bosom. (Def. 56.1 ¶ 219; Pl. 56.1 ¶ 219.)

After the EEOC charges were filed, Veliz-Amaya was singled out for more frequent rotations. Veliz-Amaya rotated between eight different work stations in June 2011, and nineteen different stations between May and December 2011. (Pl. 56.1 ¶¶ 513–14.) She received less work hours after the EEOC charges were filed. (*Id*. at ¶ 537.) She is still employed by Suffolk Laundry. (Def. 56.1 ¶ 226; Pl. 56.1 ¶ 226.)

### vii. Marlyn Gonzalez

Gonzalez alleges that she was discriminated against on the basis of her gender, subjected to sexual harassment by Singh, and retaliated against for filing an EEOC charge. (Def. 56.1 ¶ 254; Pl. 56.1 ¶ 254.) Before Singh became Plant Manager, he would come by Gonzalez's

work station and say, "Hi baby, how are you?" and "You are the prettiest worker at the laundry." (Def. 56.1 ¶ 255; Pl. 56.1 ¶ 255.)  Singh would throw her kisses and stick out his tongue.  (Def. 56.1 ¶ 255; Pl. 56.1 ¶ 255.)  Singh also put his body very close to her and touched her on the hands, hips and buttocks.  (Def. 56.1 ¶ 256; Pl. 56.1 ¶ 256.)

After Singh became Plant Manager, he continued to touch her, telling her, "If you don't want to be touched, I am the boss and you can go home."  (Def. 56.1 ¶ 257; Pl. 56.1 ¶ 257.)  On January 5, 2011, Singh touched Gonzalez's "intimate parts" and blocked her from exiting her car while touching her.  (Def. 56.1 ¶ 258; Pl. 56.1 ¶ 258.)  Singh told Gonzalez that he wanted to have sex with her while looking at her "intimate parts."  He would also look at the direction of her "intimate parts" and lick his lips.  (Def. 56.1 ¶ 259; Pl. 56.1 ¶ 259.)  One on occasion, Singh told her he "wanted to pull her panties down with his teeth."  (Def. 56.1 ¶ 260; Pl. 56.1 ¶ 260.)  Singh touched her hips and buttocks, and at one point, kissed her on the mouth and grabbed her hand.  (Def. 56.1 ¶ 261, 263; Pl. 56.1 ¶ 261, 263.)  Singh called her "baby, sweetie and Barbie." (Def. 56.1 ¶ 262; Pl. 56.1 ¶ 262.)  Singh told Gonzalez that he wanted to have oral sex with her, and sent her notes indicating that he wanted to have sex with her and that she had the most beautiful eyes in the world.  (Def. 56.1 ¶ 264; Pl. 56.1 ¶ 264.)  After Gonzalez rejected Singh, he criticized her performance, stating that she did not feed the tablecloths fast enough.  (Def. 56.1 ¶ 269.)

After she filed the EEOC charge, Gonzalez was switched to work on different machines. (Def. 56.1 ¶ 265; Pl 56.1 ¶¶ 265, 536.)  In addition, after the charges were filed, Gonzalez claims her car tires were slashed and the antenna on her car was broken, and her hours were reduced. (Def. 56.1 ¶ 271; Pl. 56.1 ¶ 271.)

### viii. Edith Cruz

Cruz began working at Suffolk Laundry in 1997. (Def. 56.1 ¶ 229; Pl. 56.1 ¶ 229.)

Singh showed Cruz notes in Spanish stating "If I didn't have a wife, I would marry you," "You

know you are pretty. You know it," and "You are beautiful, I like you." (Def. 56.1 ¶ 232; Pl.

56.1 ¶ 232.) Singh also touched Cruz, at one point touching her, while stating, "I am the one

giving the orders." (Def. 56.1 ¶ 232; Pl. 56.1 ¶ 232.) Singh sometimes would stand at her work

station and laugh. (Def. 56.1 ¶ 233; Pl. 56.1 ¶ 233.) She observed Singh make an offensive

gesture by licking his lips. (Def. 56.1 ¶ 233; Pl. 56.1 ¶ 233.) She also observed Singh touch

"many employees," including Martinez, Julia, Judith, Vicki, Marleney and Ana. (Def. 56.1 ¶¶

235–36; Pl. 56.1 ¶¶ 235–36.)

### ix. Leonel Garcia

Leonel Hernandez Garcia was the plant manager when the Claimants began working at

Suffolk Laundry, and he was involved in the hiring of some of the Intervenor-Plaintiffs. (Def.

56.1 ¶ 15; Pl. 56.1 ¶ 15.) Garcia lives with Edith Cruz and their two children. (Def. 56.1 ¶ 16;

Pl. 56.1 ¶ 16.) After Singh was promoted to Plant Manager in May 2010, Garcia no longer held

this position.

Garcia testified that at an unspecified time prior to January 2011, he told Walter Sullivan

that he witnessed Singh touch Gonzalez's buttocks. (Garcia Dep. 87:9–23.) Walter Sullivan

stated that he would talk to Singh and "tell him not to get close to the women." (*Id*. at 87:19–

23.)

According to Singh, after the Intervenor-Plaintiffs filed EEOC charges in January 2011,

he told Walter Sullivan that he had been told by one of the female employees that Garcia was

"the one that is responsible for this." (Singh Dep. 119:4–16.) Walter Sullivan stated that he

suspected that Garcia had something to do with the filing of the EEOC charges, because he believed that Garcia was "furious" that Singh had been promoted over him, and "his angle was . . . if [Garcia] filed the charges, [Walter Sullivan] will fire [Singh] and that would put [Garcia] back into the position of being the lead supervisor." (W. Sullivan Dep. 100:7–101:19.) Cathy Sullivan believed that Garcia was involved in the EEOC charges "in some way." (C. Sullivan Dep. 140:20–141:10.) Cathy Sullivan heard Walter Sullivan say that "these seven girls [who filed EEOC charges] were all [Garcia's] followers." (*Id*. at 70:16–18.)

According to Garcia, he met with the Sullivans after the EEOC charges were filed, and Walter Sullivan told Garcia that he should go on vacation immediately "so that the problem will go away." (Garcia Dep. 131:7–132:22.) Garcia did not return to work at Suffolk Laundry, as he was terminated in February 2011 for "punch[ing] in and leav[ing] work . . . without any authorization." (W. Sullivan Dep. 97:3–25.)

### x. Investigation by Suffolk Laundry

Cathy Sullivan learned of the claims against Suffolk Laundry when she received a letter from Latino Justice, dated January 28, 2011. (Def. 56.1 ¶ 276; Pl. 56.1 ¶ 276.) According to EEOC, after the EEOC charges were filed, Defendants called each of the Intervenor-Plaintiffs individually to a meeting at the Sullivans' home, with Walter Sullivan, Cathy Sullivan and their son Sullivan III. (Pl. 56.1 ¶ 493.) Cardona was also in attendance to help with translation.[9] (*Id*.) During the meetings, Defendants questioned the Intervenor-Plaintiffs about why they had not reported their claims to Walter Sullivan. (*Id*. ¶ 494.)

---

[9] The Intervenor-Plaintiffs speak Spanish and have varying degrees of familiarity with English.

16

According to EEOC, during Vilorio's meeting at the Sullivans' home, Vilorio told Defendants that she did not like Singh touching her, to which Defendants responded that she should look for another job and that they did not believe her. (*Id*. ¶ 495.) Defendants also told Veliz-Amaya that they had cameras at the laundry facility and could see everything. When Veliz-Amaya told Walter Sullivan that her complaint was against Singh, he told her that if she did not like her job, she should look for another one. (*Id*. at ¶ 496.) Defendants told Gonzalez and Castillo during their individual meetings that they never saw anything happen at the laundry facility, that they had cameras installed, and that if they did not like their jobs they should look for alternate employment because Defendants were not going to prefer them over Singh. (*Id*. at ¶ 497.) At the meeting with the Sullivans, Cardona refused to translate Amaya's complaint about Singh's conduct to Defendants stating, that he did not believe her. (*Id*. at 498.) According to Cardona, Amaya told him she wanted a different translator and when Cardona translated this, Walter Sullivan did not respond. (*Id*. at 43:21–44:6.) Velasquez did not tell the Sullivans that Singh had touched her but told them she was "mistreated." (Def. 56.1 ¶ 281; Pl. 56.1 ¶ 281.)

EEOC claims that Defendants' investigation following the claims was a "sham." (Pl. 56.1 ¶ 104.) Plaintiffs allege that after receiving notice of the Intervenor-Plaintiffs' claims, Walter Sullivan, Cathy Sullivan, Sullivan III, Singh, Leonel Hernandez Garcia, the prior plant manager, and George Velasquez, another supervisor, met to discuss the allegations. (*Id*. ¶ 476.) All of the alleged participants in the meeting denied any knowledge of the allegations. (*Id*.) According to Plaintiffs, during the meeting, Cathy Sullivan insisted that the complaints must have been made against Garcia or Velasquez. (*Id*. ¶ 477.) At some point after this meeting, Defendants met with Singh at which time Singh indicated that he was very surprised about the allegations and disclaimed any knowledge of the claims. (*Id*. ¶ 483.) During this conversation,

Singh denied sending any notes to Gonzalez. (W. Sullivan Dep. 247:20–25; Singh Dep. 311:25–312:11.) After this meeting, Cathy Sullivan prepared a statement, which Singh signed, denying the allegations. (Pl. 56.1 ¶ 484.) Defendants admit that the investigation "didn't last long" and that it was not "formal" and they did not "want to make a hoo-ha of it." (*Id*. ¶ 492.) Approximately one year later, as a result of the EEOC investigation into the Intervenor-Plaintiff's charges, the Sullivans learned that Singh had not been truthful in denying that he sent notes to Gonzalez. (W. Sullivan Dep. 248:9–24; Singh Dep. 312:10–16.) The Sullivans did not make any changes with respect to Singh's employment subsequent to learning this fact. (Pl. 56.1 ¶¶ 505–06.) According to EEOC, Singh continued to touch other female employees for nearly two years subsequent to the filing of the EEOC charges, and one year subsequent to the filing of the instant action. (Pl. 56.1 ¶ 589.)

## II.    Discussion

### a.    Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic Sec., LLC*, 558 F. App'x 89, 89 (2d Cir. 2014); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."

*Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.*  The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party."  *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).  The Second Circuit has cautioned that "'[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'"  *Taddeo v. L.M. Berry & Co.*, 526 F. App'x 121, 122 (2d Cir. 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).

### b.  Hostile work environment claim

Defendants argue that the harassment alleged on behalf of Vilorio, Guevara-Martinez, Veliz-Amaya, Velasquez, Castillo, Amaya, and Cruz do not meet the objective "severe or pervasive" standard necessary to sustain a hostile work environment claim.[10]  (Def. Mem. 34–49.)  Additionally, Defendants contend that Suffolk Laundry should not be held vicariously liable for Singh's conduct.  (*Id.* at 49–53.)

In order to establish a hostile work environment claim under Title VII, a plaintiff must produce evidence that the complained of conduct "(1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex, or another protected characteristic."  *Robinson v.*

---

[10] Defendants do not dispute that Marlyn Gonzalez has sufficiently alleged severe or pervasive harassment.  (Def. Mem. 28 n.23.)

*Harvard Prot. Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)).  To withstand summary judgment, plaintiffs must produce evidence that "the workplace was 'so severely permeated with discriminatory intimidation, ridicule, and insult, that the terms and conditions of her employment were thereby altered.'"  *Mills v. S. Conn. State Univ.*, --- F. App'x ---, ---, 2013 WL 2157955, at *2 (2d Cir. May 21, 2013) (quoting *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013)).  A single severe incident may support a claim for hostile work environment.  *See Das v. Consol. Sch. Dist. of New Britain*, 369 F. App'x 186, 189–90 (2d Cir. 2010).  Otherwise, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."  *Id.* (quoting *Alfano v. Costello*, 294 F. 3d 365, 374 (2d Cir. 2002)).

In order to establish employer liability for hostile actions taken by an employee, a plaintiff must establish that the hostile work environment can be imputed to the employer.  *See Vance v. Ball State Univ.*, 570 U.S. ---, ---, 133 S. Ct. 2434, 2443 (2013) (explaining under what circumstances an employer may be held liable for harassment by an employee); *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) ("In order to prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." (quoting *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009))). Where the harasser is a supervisor, an individual "empowered to take tangible employment actions against the victim," and "the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable."  *Vance*, 570 U.S. at ---, 133 S. Ct.

at 2439. However, where the harasser is a co-worker, "the employer is liable only if it was negligent in controlling working conditions." *Id.*

While "the central statutory purpose [of Title VII was] eradicating discrimination in employment, Title VII does not set forth a general civility code for the American workplace." *Redd*, 678 F.3d at 176 (alteration in original) (internal quotation marks omitted) (quoting *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 771 (1976) and *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The Second Circuit distinguishes between "[complaints of] sexual assaults; [other] physical contact, [whether amorous or hostile, for which there is no express or implied consent]; uninvited sexual solicitations; intimidating words or acts; [and] obscene language or gestures" and "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers," which are not protected under the law. *Redd*, 678 F.3d at 177 (alterations in original) (citations omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). "Isolated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010). "In other words, '[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Illiano v. Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 350 (E.D.N.Y. 2008) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). A plaintiff may only recover on a hostile work environment claim if the hostile work environment occurs because of an employee's protected characteristic, such as her gender.

*Rivera v. Rochester Genesee Regional Transp. Auth.*, 702 F.3d 685, 693 (2d Cir. 2012) (citing

*Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).

      In determining whether a work environment is hostile, courts assess the "totality of the

circumstances, including: 'the frequency of the discriminatory utterance; its severity; whether it

is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance.'" *Cristofaro v. Lake Shore Cent.*

*Sch. Dist.*, 473 F. App'x 28, 30 (2d Cir. 2012) (quoting *Pucino v. Verizon Wireless Commc'ns,*

*Inc.*, 618 F.3d 112, 119 (2d Cir. 2010)). In evaluating the totality of the circumstances to

determine whether a work environment is "hostile," "the crucial inquiry focuses on *the nature of*

*the workplace environment as a whole*, and a plaintiff who herself experiences discriminatory

harassment *need not be the target of other instances of hostility in order for those incidents to*

*support her claim*." *Kaytor,* 609 F.3d at 547 (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560,

570 (2d. Cir. 2000) (emphasis in *Kaytor*)). "[C]onduct directed at other employees is part of the

totality of circumstances to be considered in evaluating a hostile work environment claim."

*Byrne v. Telesector Res. Group, Inc.*, No. 04-CV-0076S, 2007 WL 962929, at \*18 (W.D.N.Y.

Mar. 29, 2007); *see also Adams v. Austal, U.S.A., LLC.*, 754 F.3d 1240, 1250 (11th Cir. 2014)

("Courts conduct the objective assessment from the perspective of a reasonable person in the

plaintiff's position, *knowing what the plaintiff knew*." (emphasis added)); *Perry v. Ethan Allen,*

*Inc.*, 115 F.3d 143, 150–51 (2d Cir. 1997) ("Since one of the critical inquiries with respect to a

hostile environment claim is the nature of the environment itself, evidence of the general work

atmosphere is relevant. Thus . . . in a hostile workplace case, the trier of fact must examine the

totality of the circumstances, including evidence of sexual harassment directed at employees

other than plaintiff." (internal quotation marks omitted)).

As discussed below, viewing the facts in the light most favorable to EEOC, the non-moving party, the Court finds that there is sufficient evidence in the record to permit a reasonable jury to find severe or pervasive conduct, and to find that Suffolk Laundry can be held liable for Singh's conduct.

Defendants argue that the EEOC has "aggregated" the claims of the Intervenor-Plaintiffs in an effort to "embellish" the severity of their individual harassment claims. (Def. Reply 39.) According to Defendants, remarks and conduct that Singh may have directed at other Intevenor-Plaintiffs or other Suffolk Laundry employees is of "limited probative value" in substantiating each individual hostile work environment claim. (Def. Mem. 38.) EEOC argues that each Intervenor-Plaintiff observed Singh's harassment directed at other female employees which contributed to the hostile work environment and should be considered by the Court in its review of the totality of the circumstances. (Pl. Opp. 26.)

Each Intervenor-Plaintiff has alleged harassment individually based on Singh's conduct towards them and, in addition, each has observed Singh engage in certain unwelcomed or inappropriate conduct towards other Intervenor-Plaintiffs and/or female employees of Suffolk Laundry. Though Defendants are not seeking summary judgment as to Gonzalez's hostile work environment claim, to the extent that the evidence suggests that Singh's conduct towards Gonzalez created or contributed to a hostile work environment for other Intervenor-Plaintiffs, his conduct towards Gonzalez is relevant to the Court's analysis of the claim by those Intervenor-Plaintiffs' hostile work environment claims. Even if a particular Intervenor-Plaintiff was not present or the target of a discriminatory remark by Singh, "a jury could plausibly find that the persistently offensive conduct created an overall hostile or abusive environment, which

exacerbated the effect of the harassment . . . experienced individually." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)

### i.  Marlyn Gonzalez

Singh is alleged to have sexually assaulted Gonzalez by blocking her exit from her car, putting his hand on her knee and moving it up her leg to her "intimate part." (Gonzalez Dep. 79:3–80:13.)  On a separate occasion, Singh forcibly kissed Gonzalez on the mouth. (*Id.* at 87:5–13.)  Singh repeatedly touched Gonzalez on a "near daily basis," touching her buttocks, hips and hands, and he frequently propositioned Gonzalez for sex. (Pl Opp. 3.)  Gonzalez found his conduct offensive and inappropriate. (*Id*. at 4.)  Singh also tried to buy her presents, which she refused. (*Id*.)  Certain of the Intervenor-Plaintiffs either observed Singh's conduct towards Gonzalez or learned about it. (*See* Vilorio Dep 80:3–5 (testifying that she saw Singh touch Gonzalez); Castillo Dep. 111:12–112:5 (testifying that she saw Singh touch Gonzalez's waist, chin, and arm on various occasions and that she saw Singh give Gonzalez notes which she later learned stated that Singh wanted to "make love to [Gonzalez]" and "have oral sex" with her); Velasquez Dep. 65:5–66:20 (testifying that she saw Singh touch Gonzalez); Guevara Dep. 64:9–12 (testifying that she saw Singh get very "close" to Gonzalez).)

The Court considers Singh's actions directed at other Intervenor-Plaintiffs, including his actions toward Gonzalez, and other female employees in assessing the viability of the individual claims of the Intervenor-Plaintiffs.  Defendants argue that the individual claims by the Intervenors  other than Gonzalez, are insufficient to meet the objective "severe or pervasive" standard, claiming that certain work environments, such as the environment at issue here, are not "hostile as a matter of law, despite the presence of" "offensive," "vulgar," or "grotesque,"

behavior.  (Def. Mem. 36–37.)  The Court addresses each Intervenor-Plaintiffs' hostile work environment claim.

### ii.  Marina Vilorio

Defendants argue that Vilorio's allegations are insufficient to state a claim because "touching, unaccompanied by any sexual comments or looks, is insufficient to support a claim of hostile work environment."  (Def. Mem. 40.)  Defendants further contend that Vilorio fails to allege harassment that is "sufficiently continuous and concerted" to alter the conditions of Vilorio's working environment."  (*Id.*)  The Court disagrees with Defendants.

Vilorio alleges repeated unwanted touching by Singh over a period of approximately 8 months, from when Singh became plant manager in May 2010 until she filed her EEOC charge in January 2011.  (Def. 56.1 ¶¶ 55, 76; Pl. 56.1 ¶¶ 55, 76.)  Singh caressed her shoulder with his hand possibly more than fifteen times, (Vilorio Dep. 67:23–69:13), touched her face and waist several times, (*id.* at 93:13–18), and pushed her several times when she walked by him, (*id.* at 93:22–94:3).  Despite the fact that Vilorio told Singh not to touch her on several occasions, he continued to do so, (*id.* at 100:2–7), and on several occasions Singh asked her for a kiss, (*id.* at 83:4–6).  Moreover, in addition to Singh's conduct and actions directed at her, Vilorio also observed or heard about Singh's conduct towards other employees at Suffolk Laundry — she witnessed Singh touch Azucena, Castillo, and Marlyn Gonzalez several times on the waist and shoulders, (*id.* at 78:14 –79:20), was told by Castillo that Singh had asked her to sit on his legs, (*id.* at 86:13–18), and was told by Gonzalez that Singh also touched her waist and shoulder and had sent her notes, (*id.* at 87:20 –88:24).

Consistent with the Second Circuit's instruction to "not view individual incidents in isolation" or "review the record in a piecemeal fashion," *Redd*, 678 F.3d at 176, and to review

the totality of the circumstances, the Court finds that there is sufficient evidence from which a rational juror could find that the recurring nature of Singh's unwanted physical contact with Vilorio — "caressing" her on fifteen occasions, touching her in her face and at the waist, and asking her for a kiss on several occasions over an 8 month period, despite her requests that he stop the behavior — in addition to her observations of Singh's conduct engaging in similar harassment of other female employees, were sufficiently pervasive as to alter Vilorio's working conditions creating a hostile work environment.[11] *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d. Cir. 2001) (denying summary judgment where plaintiff presented evidence that the alleged harasser "grabb[ed] and placed his hand on [plaintiff's] hand on a daily basis," "used to touch [her] hair a lot," leered at her and tried to peer down her blouse); *Howard v. Cannon*

---

[11] In seeking to dismiss all of the Intervenor-Plaintiffs' hostile work environment claims, except for the claim alleged by Gonzalez, Defendants have cited various cases in which employers were granted summary judgment and have argued that the alleged harassment of the Intervenor-Plaintiffs in those cases were similar to or more egregious than the conduct alleged here. (Def. Mem. 40, 43, 46.) As the Second Circuit has instructed, the determination as to whether, under the totality of the circumstances, a plaintiff has proffered sufficient evidence to establish a hostile work environment claim is "to be made on a case by case basis considering all the individual facts at hand." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 607 (2d. Cir. 2006) (noting that "the fact that . . . actions did not constitute a hostile work environment in [one] case, when considered as part of all the circumstances there, does not establish a rule that similar actions in another context would not, as a matter of law amount to one"). There is no *per se* rule delineating how many unwanted touches or inappropriate comments create a hostile work environment, and the Court will not impose one here based on Defendants' suggestion that other courts under different circumstances found the evidence in those cases to be insufficient to create genuine issues of fact. *See Richardson v. N.Y. State Dept. of Corr. Serv.*, 180 F.3d 426, 439 (2d Cir. 1999) ("[T]here is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." (quoting *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir. 1993))), *abrogated on other grounds*, *Burlington Northern & Santa Fe Railway Co., v. White*, 548 U.S. 53 (2006)). "The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d. Cir. 2001) (citing *Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d. Cir. 1997)), making summary judgment only appropriate where the application of the law to the facts "will reasonably support only one ultimate conclusion." *Schiano*, 445 F.3d at 605.

*Indus.*, No. 11-CV-6100, 2012 WL 5373458, at *7 (W.D.N.Y. Oct. 30, 2012) (finding that plaintiff raised a triable issue of fact of severe or pervasive harassment where over a one year period the defendant "propositioned her twice to have sex with him, grabbed her face, . . tried to kiss her once or twice, [and] touched her butt several times); *cf. Redd*, 678 F.3d at 180 ("When entering a workplace, reasonable people expect to have their autonomy circumscribed in a number of ways; but giving up control over who can touch their bod[ies] is usually not one of them." (citing *Patton*, 455 F.3d at 816)). *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 484 –85 (S.D.N.Y. 1999) ("[T]he law . . . deems unwanted touching to be a highly significant factor contributing to a hostile work environment.").

### iii. Azucena Castillo

Defendants argue that the allegations as to Singh's conduct towards Castillo lack the pervasiveness required for a hostile work environment claim. (Def. Mem. 41–42.) The Court finds that there is sufficient evidence to create a genuine issue of fact as to whether Castillo was subject to pervasive harassment creating a hostile work environment.

Viewing the evidence in the light most favorable to Castillo, the evidence shows that Singh conditioned granting certain work-related requests on sexual favors. (Pl. 56.1 ¶ 410.) On one occasion, on a day when she was sick and requested permission to leave work early, Singh told Castillo that he would allow her to leave early if he could place his ear on her chest, or if she sat on his lap. (Castillo Dep. 77:10–78:7.) Castillo refused. (*Id*. at 78:4–5.) Singh also made unwelcomed physical contact with Castillo many times, including grabbing Castillo's pants and pulling them up, (*id*. at 91:23–93:5), and touching Castillo's chin and her waist several times, (*id*. at 93:13–15, 114:23–115:3). By conditioning the exercise of his discretion to grant Castillo's request to leave work early when she was sick on the exchange of an intimate and unwanted act

— sitting on his legs or allowing him to place his ear on her chest, and grabbing Castillo and pulling her pants up, as well as touching Castillo on her chin and waist on several occasions, a reasonable jury could find that Singh created a hostile work environment.

Moreover, in addition to personally experiencing this conduct, Castillo repeatedly observed and was also informed about Singh's harassing conduct towards other women at Suffolk Laundry.   Castillo saw Singh touch Gonzalez and Vilorio between ten and fifteen times, and learned from Gonzalez that Singh was giving her notes indicating that he "wanted to make love to her" and to "have oral sex with her."  (*Id.* at 111:23 –112:6.)

 The evidence could support a reasonable finding that Singh's unwelcomed physical contact with Castillo and other female employees coupled with the sexually-explicit notes that Singh sent to Gonzalez all affected Castillo's working environment so as to create a hostile working environment.  *See Egnoto v. Univ. Orthopedics & Sports Med.*, No. 98-CV-1244, 1999 WL 224609, at *3 (N.D.N.Y. Apr. 14, 1999) (rejecting the defendants' argument that plaintiff's allegations of harassment, including sexually explicit notes, an offer to plaintiff that she lick chalk off of his pants, and the harasser's frequent touching of his genital area amounted to "few instances" of inappropriate conduct suitable for summary judgment); *Williams v. The Bd. of Hudson River*, No. 99-CV-1282, 2001 WL 1217199, at *6 (N.D.N.Y. Sept. 23, 2001) (denying summary judgment where plaintiff alleged "numerous incidents where [harasser] implicitly and inappropriately injected sex into the workplace"); *cf. Forrest v. Dynamic Sec., Inc.*, No. 00-CV-3423, 2002 WL 246401, at *2 (E.D. La. Feb. 19, 2002) (finding that "evidence of sexual harassment is relevant and admissible to show the workplace conditions and environment" for purposes of a Title VII gender discrimination claim).  Castillo has sufficiently raised an issue of fact as to whether, under the totality of these circumstances, Singh created a hostile work

environment for Castillo.

### iv. Maria del Carmen Amaya

Defendants argue that Amaya has "vaguely asserted" that Singh touched her every day and that although she alleges that Singh touched her neck and shoulder, she "provides no evidence of sexual innuendo." (Def. Mem. 43.) Defendants argue that because Amaya "could not cite specific instances where she was touched," and instead made vague assertions, "much of [her] testimony would be inadmissible at trial." (Def. Reply 12.) Defendants further assert that Amaya's harassment claim "does not meet the severe or pervasive standard as a matter of law." (Def. Mem. 44.)

Amaya testified that "every time" Singh passed the area where she worked, he touched her neck and shoulder. (Amaya Dep. 42:8–43:12.) In addition, when Amaya asked Singh to restore her work schedule to six days a week, instead of the four he had reduced it to, Singh requested that she give him a kiss on the cheek, (*id*. at 48:24–49:8), sit on his legs or give him a hug, (*id*. at 41:14–18). Singh asked her to sit on his legs and to give him a hug more than ten times. (*Id*. at 41:21–42:2.) On one occasion, when Amaya sustained a work-related injury to her finger, Singh insisted that she continue working and that her injury was "not important." (*Id*. at 23:12–24:6.) Singh also called Amaya "stupid," when he learned that she did not go to work one day due to her injury, and subsequently reduced her work schedule. (*Id*. at 39:4–8.)

In addition to the conduct directed at her, Amaya also saw Singh touch Castillo on the hips once. (*Id*. at 83:18–22.) Singh's unwelcome touches to Amaya's neck and shoulder, and his numerous sexual advances to sit on his legs or hug him, present a triable issue of fact as to whether Amaya experienced a hostile work environment as a result of Singh's actions. *See Redd*, 678 F.3d at 172 (reversing district court conclusion that the acts of a defendant who

"brushed up against" the plaintiff's breasts three times and once rubbed her had "consisted of relatively minor, incidental physical contact"); *Stathatos v. Gala Resources, LLC*, No. 06-CV-13138, 2010 WL 2024967, at *5–6 (S.D.N.Y. May 21, 2010) (summary judgment denied where plaintiffs claimed that harasser touched their shoulders and arms, and were exposed to sexually explicit conversations and photographs, and to sexist jokes).

### v. Mirian Velasquez

Defendants contend that Velasquez's hostile work environment claim should be dismissed because it fails to meet the severe or pervasive standard. Defendants characterize Singh's conduct towards Velasquz as "too innocuous," lacking in sexual innuendo, and constituting "only a few isolated incidents of harassment." (Def. Mem. 44–45; Def. Reply 13.)

According to Velasquez, Singh touched her shoulder two to three times during the relevant period. (Velasquez Dep. 55:14–20, 56:17–57:5.) When she asked him to stop, he "just smiled" in response, but he did not touch her shoulder again. (*Id*. at 57:23–58:4, 130:19–23.) On approximately two occasions, Singh looked at her from head to toe and stated that she looked "very good." (*Id*. at 71:24–72:7.) In addition to the conduct directed at her, Velasquez also observed several of Singh's conduct towards other women at Suffolk Laundry — she witnessed Singh touch Gonzalez's hands twice, Gonzalez's shoulder "many times," (*id*. at 69:12–20), Guevara-Martinez's shoulder "several times," (*id*. at 69:21–25), Amaya's shoulders "many times," (*id*. at 70:2–7), and a non-party employee, Dina Monroy's, shoulder three times, (*id*. at 71:11–13). Velasquez also saw Singh offering Gonzalez gifts and observed that it made Gonzalez uncomfortable. (*Id*. at 81:15–21.)

Although the actions complained of by Velasquez present a close call, a rational juror reviewing the totality of the circumstances could find these incidents sufficiently hostile to be

actionable. The evidence, credited in favor of Velasquez, suggests that Velasquez, while only subject to Singh's unwanted touching twice and his comment about her looks after staring at her once, her observations of him touching other female employees several times and with respect to at least one Intervenor-Plaintiff, witnessing her discomfort, is sufficient for a jury to find that due to Singh's widespread and constant unwanted attention and contact with other female employees, the conditions of Velasquez's work environment were altered. *See Messer v. Fahnestock & Co.*, No. 03-CV-4989, 2008 WL 4934608, at *15 (E.D.N.Y. Nov. 18, 2008) (denying summary judgment on sexual harassment claim where plaintiff alleged that her harasser "massaged her shoulders without permission, told her on one occasion that she 'loo[ked] very sexy'" and commented on her appearance and personal life despite indications from plaintiff that his comments and attention were unwelcomed); *Kaytor,* 609 F.3d at 547 ("[A] plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim." (emphasis omitted)). *Byrne v. Telesector Res. Group, Inc.*, 2007 WL 962929, at *18 ("[C]onduct directed at other employees is part of the totality of circumstances to be considered in evaluating a hostile work environment claim.").

## vi. Rosa Guevara-Martinez

Defendants argue that Guevara-Martinez's hostile work environment claim does not meet the objective severe or pervasive standard either. The Court disagrees. Guevara-Martinez was subject to continuous and unwanted physical contact and/or attention by Singh, and to inappropriate comments. Singh touched her back, face, hand, buttocks, waist and shoulder. (Guevara-Martinez Dep. 58:4–12, 62:9–10.) Singh touched her buttocks once while he was passing by her working area. (*Id*. at 58:13–60:7.) When he touched her face, he told her that she looked very pretty. (*Id*. at 50:11–13.) On another occasion, Singh told her she had a "nice rear."

(*Id*. at 67:12–18.)  Singh also made lewd gestures to Guevara-Martinez on two occasions, once he pointed to his penis suggesting it was "swollen" and "big," and on another occasion, he used an air hose to blast air by his penis and laughed.  (*Id*. at 84:20–86:12.)  Guevara-Martinez also saw Singh touch other employees at Suffolk Laundry.  (*Id*. at 63:24–64:18 (she observed Singh get "very close" to Gonzalez and touching Gonzalez's back and waist); *id*. at 65:8–14 (she saw Singh touch Castillo and pull up her pants).)  A jury could reasonably find that Singh's conduct created a hostile work environment for Guevara-Martinez.  *See Stathatos*, 2010 WL 2024967, at *5 (noting that the plaintiff's allegation that her harasser "intentionally groped her buttocks can alone defeat defendants' motion for summary judgment"); *D'Annunzio*, 2010 WL 2024967, at *8 (the fact that plaintiff "was subjected to on-going comments about her figure and how she could be sexually pleasured outside of work" supported denial of summary judgment); *Rivera v. Prudential Ins. Co. of Am.*, No. 95-CV-829, 1996 WL 637555, at *8 (N.D.N.Y Oct. 21, 1996) ("[A] jury could reasonably find that [the harasser's] remark about [plaintiff's] breasts and his rubbing up against her with his groin, combined with his ongoing leering and offensive noises, all contributed to an environment in which her performance would be affected.").

### vii.  Xiomara Veliz-Amaya

Defendants contend that Veliz-Amaya's hostile work environment claim is based on "only one instance of possible accidental touching," and her witnessing Singh touch other female employees.  (Def. Reply 15.)  Defendants argue that this is insufficient to state a hostile work environment claim.  (Def. Mem. 47–48.)

Contrary to Defendants' claims, Veliz-Amaya alleges several instances of harassing conduct.  After Singh became Plant Manager, he began to stand close to her two or three times a day, he looked at "her intimate parts," and remarked that she looked pretty many times.  (Veliz-

Amaya Dep. 84:11–86:6.)  Singh also asked her out several times.  (*Id*. at 88:24–89:2.)  Once, Veliz-Amaya saw him looking at her breasts and licking his lips with his tongue out.  (*Id*. at 135:17–136:18.)  On a separate occasion, when she requested to leave work early because she was ill, Singh accused her of being pregnant.  Veliz-Amaya also observed Singh touch several of her female co-workers, and witnessed Singh touch Castillo's back and bottom.  (Def. 56.1 ¶¶ 221–22; Pl. 56.1 ¶¶ 221–22.)  Through the date of her deposition in this case, Singh was still touching women at Suffolk Laundry.  A jury could reasonably find that Singh's conduct created a hostile work environment for Veliz-Amaya.  Evidence of Singh's close contact, uncomfortable staring, and inappropriate gestures directed at Veliz-Amaya, and his widespread physical unwanted contact with other female employees could support such a finding.  *See Burns v. County of Schenectady*, No. 07-CV-0776, 2009 WL 2568546, at *3 (N.D.N.Y. Aug. 18, 2009) (finding that a jury could find that harassment was severe or pervasive where the record indicated that harasser put his hands on plaintiff's shoulder, leered at her body, rubbed his hand on her leg and followed her to the restroom).

### viii.  Edith Cruz

Defendants characterize Cruz's harassment claim as "the weakest of all the Intervenor-Plaintiffs."  (Def. Mem. 48.)  Defendants argue that Cruz "did not believe that her harassment was due to her gender but because she was Garcia's wife and was Veliz-Amaya's friend," and therefore, Singh's conduct towards her is not actionable as a gender harassment claim.  (Def. Mem. 49.)  Defendants also argue that "[e]ven if considered, Cruz's allegations of flirty compliments and notes along with the two instances of touching simply do not rise to the level of severity needed to successfully establish a hostile work environment."  (*Id*.)

According to Cruz, after Singh became Plant Manager, he started "flirting" with her,

stating that she was pretty, cute, wonderful and beautiful. (Cruz Dep. 56:11–15.) Singh shined a

light on her body with a lamp. (*Id*. at 56:17.) He sent her notes stating, "If I didn't have a wife, I

would marry you," "You know you are pretty," "You are beautiful," and "I like you." (*Id*. at 8–

12.) Singh would indicate that he wanted to touch her, raising his hand in a way to suggest that

he was going to touch her. (*Id*. at 58:23–59:6.) On one occasion, Singh touched her in the area

between her chest and shoulder. (*Id*. at 59:11–60:11.) He did not touch her again "because [she]

was always alert and would tell him, don't try to touch me" on several occasions. (*Id*. at 60:12–

22.) Cruz also witnessed Singh touch other employees — she saw Singh getting "very close" to

Veliz-Amaya and noticed that it made her uncomfortable, (*id*. at 132:17–25) and saw Singh

touch "Rosa," "Julia," "Judith," and "Vicki,"[12] (*id*. at 133:9–136:24). Singh's conduct towards

Cruz, as well as his conduct to others that Cruz observed, is sufficient evidence from which a

reasonable jury could find that his conduct created a hostile work environment, particularly in

light of Singh's conduct directed at other female employees. *Guzman v. News Corp.*, No. 09-

CV-9323, 2013 WL 5807058, at *14–15 (S.D.N.Y. Oct. 28, 2013) (sufficient evidence to create

triable issue of fact where plaintiff alleged among other incidences, that the defendant

commented on her appearance every time he saw her, leered at her in a suggestive manner,

inappropriately touched another female colleague and made lewd remarks towards the other

employee). Moreover, Singh's comments regarding Cruz's appearance and his conduct with

other female employees are sufficient to support a finding that his conduct was motivated by

Cruz's gender. *See Leopold v. Baccarat, Inc.*, 174 F.3d 261, 268–69 (2d. Cir. 1999)

---

[12] Cruz did not indicate the last names of Rosa, Julia, Judith or Vicki. It is unclear if she was referring to Rosa Guevara-Martinez, an Intervenor-Plaintiff, or another employee with the first name Rosa. (Cruz Dep. 133:17–20 (testifying that she did not know if she saw Singh touching Rosa Martinez or Rosa Alvarez because she did not know the person's last name).)

(supervisor's comments that he wanted to fire plaintiff and others and "replace them with 'young and sexy' hires" was sufficient to support finding that supervisor's comments were discriminatory on the basis of sex).

### c. Suffolk Laundry's liability

Because the Court finds that Intervenor-Plaintiffs have presented evidence from which a reasonable jury could find that Singh created a hostile work environment, the Court must determine whether there is a specific basis for imputing liability to Suffolk Laundry.

An employer's liability under Title VII "may depend on the status of the harasser." *Vance*, 570 U.S. at ---, 133 S. Ct. at 2439. "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Id*. If, however, the harassing employee is a supervisor, and the "supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." *Id*. Under the NYSHRL, an "employer cannot be held liable [under state law] for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it." *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 311 (2004) (quoting *State Div. of Human Rights on Complaint of Greene v. St. Elizabeth's Hosp.*, 66 N.Y.2d 684, 687 (1985)).

EEOC argues that Suffolk Laundry is strictly liable for Singh's harassment of the Claimants because Singh was their supervisor when he became the Plant Manager in May 2010. (Pl. Opp. 39.) EEOC further argues that even if Singh is not considered a supervisor, Suffolk Laundry is nevertheless liable for his harassing conduct because it was negligent in controlling the working conditions. (*Id*. at 50.) Defendants contend that Singh was not a supervisor and that, because there was a grievance process available to the Intervenor-Plaintiffs, Plaintiffs cannot establish that Suffolk Laundry was negligent. (Def. Mem. 50–51.) As discussed below,

the Court finds that Suffolk Laundry was negligent in controlling the working conditions of the Claimants and therefore does not consider whether Singh is a "supervisor" for purposes of imposing liability.  Because the standard for determining employer liability under NYSHRL is different from Title VII, the Court considers each separately.

### i. Title VII liability

Under Title VII, "[w]hen harassment is perpetrated by the plaintiff's coworkers, an employer will be held liable if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."  *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 (2d Cir. 2011) (citation and internal quotation marks omitted); *Richardson v. N.Y.S. Dep't of Corr. Serv.*, 180 F.3d 426, 441 (2d Cir. 1999) ("[I]f the harasser is the victim's co-worker, the employer will be liable only if it is negligent, that is, if it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."); *see also Duch*, 588 F.3d at 762 (imputing liability for employee harassment to employer requires a showing that plaintiff's employer "'failed to provide a reasonable avenue for complaint' or that 'it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" (quoting *Howley v. Town of Stratford,* 217 F.3d 141, 154 (2d Cir. 2000)).  "[E]ven where an employer has no formal sexual harassment policy, a court may still find, as a matter of law, that the plaintiff in fact knew how to make a complaint and that the complaint was adequately addressed."  *Suares v. Cityscape Tours*, No. 11-CV-5650, 2014 WL 969661, at *9 (S.D.N.Y. Mar. 12, 2014).

The evidence supports Intervenor-Plaintiffs' argument that "Defendants had no written or oral policies" regarding sexual harassment, "did not have adequate procedures in place for employees to report sexual harassment[,] and did not properly respond once [they] became aware

of the allegations of sexual harassment." (Pl. Opp. 51.)  Defendants argue that Suffolk Laundry had a complaint procedure, pointing to the anti-discrimination policy contained in the contract between Suffolk Laundry and Local 660.  (Def. Mem. 51.)

During the relevant time period, Suffolk Laundry did not have an internal sexual harassment policy.  (W. Sullivan Dep. 102:13–16.)   Defendants point to the existence of an anti-discrimination policy in its collective bargaining agreement with Local 660 and an accompanying grievance procedure.  (Def. Reply 23.)  According to Defendants, the Intervenor-Plaintiffs could have taken advantage of the union's grievance procedure process.  (*Id*.) However, the evidence shows that many of the Intervenor-Plaintiffs never received a copy of the collective bargaining agreement and did not know of its policy regarding discrimination. (Pl. 56.1 ¶¶ 452–458; *see e.g.*, Gonzalez Dep. 84:18–22 (testifying that she was never shown a copy of the union contract); Veliz-Amaya Dep. 38:3–5 (testifying that she never got anything in writing from or about the union).)  Cathy Sullivan, the co-owner and Corporate Secretary of Suffolk Laundry, testified that she did not know if employees received copies of the collective bargaining agreement.  (C. Sullivan Dep. 113:5–8.)  Singh  did not know whether Suffolk Laundry had a policy prohibiting sexual harassment, and he was never told by anyone that there was a Suffolk Laundry policy prohibiting sexual harassment.  (Singh Dep. 120:22–4.)

Where, as here, the alleged anti-discrimination policy in the collective bargaining agreement was not disseminated and was virtually unknown by Singh, the alleged harasser, and by the victims, the Court cannot conclude that Suffolk Laundry provided a reasonable avenue of complaint to redress and prevent harassment.  *See Hill v. Children's Vill.*, 196 F. Supp. 389, 399 (S.D.N.Y. 2002) ("[M]erely possessing a written sexual harassment policy is insufficient to

demonstrate reasonable care in preventing sexual harassment; the written policy must also be reasonably promulgated.").

In addition to not having a sexual harassment policy or disseminating its anti-discrimination policy, Suffolk Laundry did not provide any sexual harassment training to any of its employees, and did not have any procedures in place for internal reporting of sexual harassment. (C. Sullivan Dep. 153:4–154:8.) Moreover, Defendants have not shown that Suffolk Laundry took reasonable care to correct or respond to complaints of harassment. Garcia testified that, prior to the filing of the EEOC charges, he told Walter Sullivan that he witnessed Singh touch Gonzalez's buttocks. (Garcia Dep. 87:9–23.) Walter Sullivan stated that he would talk to Singh and "tell him not to get close to the women." (*Id*. at 87:19–23.) However, the harassment continued and Singh was never advised about any policy regarding sexual harassment.

Nor is there any conclusive evidence demonstrating that the Intervenor-Plaintiffs knew how to make a complaint about the harassment they suffered. Indeed, the evidence suggests otherwise. (*See* Amaya Dep. 76:19–4 (Amaya testifying that she tried to tell Walter Sullivan about Singh's conduct through Cardona as an interpreter, but he refused to translate it to Walter Sullivan).) Because a rational juror could find that Suffolk Laundry "provided no reasonable avenue for complaint," *see Rojas*, 660 F.3d at 107, and therefore that it was negligent in controlling working conditions, Suffolk Laundry may be subject to liability under Title VII as Singh's employer.

### ii. NYSHRL liability

Under the NYSHRL, "[a]n employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or

approving it.'" *Romero v. City of New York*, 839 F. Supp. 2d 588, 635 (E.D.N.Y. 2012) (quoting *Doe v. State*, 933 N.Y.S.2d 688, 690 (App. Div. 2011). "Condonation, which may sufficiently implicate an employer in the discriminatory acts of its employee to constitute a basis for employer liability under the Human Rights Law, contemplates a knowing, after-the-fact forgiveness or acceptance of an offense." *St. Elizabeth's Hosp.*, 66 N.Y.2d at 687; *see Selmanovic v. NYSE Grp., Inc.*, No. 06-CV-3046, 2007 WL 4563431, at *4 (S.D.N.Y. Dec. 21, 2007) (same). Alternatively, an employer's "calculated inaction in response to discriminatory conduct, may as readily as affirmative conduct, indicate condonation." *Guzman v. Macy's Retail Holdings, Inc.*, No. 09-CV-4472, 2010 WL 1222044, at *11 (S.D.N.Y. Mar. 29, 2010) (quoting *Melendez v. Int'l Serv. Sys., Inc.*, No. 97-CV-8051, 1999 WL 187071, at *15 (S.D.N.Y. Apr. 6, 1999)).

EEOC has submitted sufficient evidence from which a jury could find that Suffolk Laundry, through the Sullivans, condoned the actions of Singh by forgiving or accepting his harassment of Gonzalez subsequent to the offense, while continuing to believe his version of events as to the remaining allegations of harassment. The Sullivans took some proactive measures in response to learning about the EEOC charges of discrimination filed by the Intervenor-Plaintiffs by telling Singh not to touch any of the Intervenor-Plaintiffs and meeting with each of the Intervenor-Plaintiffs and assuring several of them that they should come directly to Walter Sullivan in the future with any complaints. (Def. 56.1 ¶¶ 76, 107, 165; Pl. 56.1 ¶¶ 76, 107, 165.) However, there is ample evidence in the record from which a jury could conclude that the Sullivans actions, viewed as a whole, amounted to a condonation or tacit acceptance of Singh's conduct. According to EEOC, during these meetings the Sullivans also informed several Intervenor-Plaintiffs that they did not believe them and that they would not believe the

Intervenor-Plaintiffs over Singh. (Pl. 56.1 ¶¶ 76, Vilorio Dep. 94:11–95:8; Gonzalez Dep. 101:15–18; Castillo Dep. 130:23–131:20.) In addition, several were encouraged to find another job if they did not like working at Suffolk Laundry. (*See, e.g.*, Gonzalez Dep. 102:10–21; Castillo Dep. 130:23–131:20; Vilorio Dep. 94:11–95:8.)

Moreover, after Walter Sullivan learned that Singh had in fact sent notes to Gonzalez even though Singh previously had denied doing so, he continued to believe that Singh was telling the truth with respect to "the other allegations," because Walter Sullivan "was at the workplace," and "would have [seen] something or heard something." (W. Sullivan Dep. 249:13–25.) According to Cathy Sullivan, Singh told Walter Sullivan "that there was nothing in the notes that was derogatory or hurtful. He said that she was pretty and that he complimented her." (*See* C. Sullivan Dep. 137:11–18.) Walter Sullivan did not fire Singh or otherwise punish him, and the only way that Singh's responsibilities were changed was that he was told "not to confront or interact with any of the plaintiffs." (W. Sullivan Dep. 271:5–19.) Although the evidence establishes that Singh stopped touching the Intervenor-Plaintiffs after the filing of their EEOC charges, (Def. 56.1 ¶¶ 104, 284; Pl. 56.1 ¶¶ 104, 225, 284), EEOC proffers evidence that Singh's harassment of other women at Suffolk Laundry continued, permitting the inference that Suffolk Laundry failed to take reasonable corrective action, (Pl. 56.1 ¶ 284). Moreover, though the EEOC charges were filed in January 2011, Singh testified at a deposition in February 2013, over two years later, that he was still unaware of any policy prohibiting sexual harassment. (Singh Dep. 120:22–121:7.)

The Sullivans' actions in failing to provide Singh with any guidance about, or prohibitions against, sexual harassment, their actions in telling the Intervenor-Plaintiffs that they did not believe them and would not give them "preference" over Singh, and their actions in

failing to remove Singh from further interactions with female employees, could be found by a jury to be evidence that Suffolk Laundry condoned Singh's harassing conduct after the fact, resulting in liability to Suffolk Laundry.  *See Brown v. City of New York*, No. 11-CV-2915, 2013 WL 3789091, at *18 (S.D.N.Y. July 19, 2013) (noting that evidence that "defendants did not remove Miller from the workplace or take other appropriate preventive action until his conduct escalated" weighed toward a finding that harassing employee's conduct could be imputed to the employer under the NYSHRL); *Hill*, 196 F. Supp. 2d at 401 (finding that plaintiff's allegation that employer's "investigation of [harassing co-worker's] sexual harassment — which consisted of asking general questions (that [were] not created in advance) and not taking any notes — was so ineffective that it was meaningless," and that the investigator, "[d]espite statements from [plaintiff and three co-workers] believed [the alleged harasser's] denials because he had known [him] for 10 years," was sufficient to plausibly allege that the employer's determination that here had been no harassment "a foregone conclusion, therefore . . . indicat[ing] condonation of [the alleged harasser's] conduct.").

### d.  Individual Liability of the Sullivans under NYSHRL § 296(1)

Defendants argue that the Sullivans cannot be held individually liable pursuant to the NYSHRL.  The NYSHRL allows for individual liability under two theories: (1) if the defendant has "an ownership interest" in the employer or has "the authority to hire and fire employees," *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995) (discussing N.Y. Exec. Law § 296(1)),[13] and (2) if the defendant aided and abetted the unlawful discriminatory acts of others,

---

[13] In *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995) the Second Circuit noted that "an employee is not individually subject to suit under § 296 of the [NYS]HRL as an employer 'if he is not shown to have any ownership interest or any power to do more than carry out personnel

N.Y. Exec. Law § 296(6).[14]  EEOC argues that the Sullivans are subject to individual liability pursuant to § 296(1) as owners of Suffolk Laundry.[15]  (Pl. Mem. 76.)

It is undisputed that Walter and Cathy Sullivan are co-owners of Suffolk Laundry.  (Joint Pre-Trial Order ("JPTO") ¶ 7.)  Furthermore, they have authority to "do more than carry out personnel decisions made by others," which subjects them to liability under § 296(1) of the NYSHRL.  *See Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 53 (2d Cir. 2014) ("[A]s a general rule, individuals may be subject to liability as employers 'if they have ownership interests in the [employer] or do more than carry out personnel decisions of others.'" (alteration in original) (quoting *Townsend v. Benjamin Enters., Inc.,* 679 F.3d 41, 57 (2d Cir. 2012))).

Defendants argue that the Sullivans cannot be held liable pursuant to § 296(1) because the Second Circuit's holding in *Tomka* is "based upon a faulty reading of the New York Court of Appeals decision in *Patrowich . . . .*"  (Def. Mem. 68 (citing *Kaiser v. Raoul's Rest. Corp.*, 899 N.Y.S.2d 210 (2010)).)  Defendants argue that the New York Court of Appeals has never held

---

decisions made by others.'"  Tomka, 66, F.3d at 1317 (quoting *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 542 (1984))), *abrogated on other grounds by Ellerth*, 524 U.S. at 742.

[14]  Section 296(6) of the NYSHRL provides that: "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."  N.Y. Exec. Law § 296(6).

[15]  EEOC also argues that "alternatively, Cathy Sullivan and Walter Sullivan II may be found individually liable under NYSHRL § 296(6) . . . ."  The Second Circuit has read § 296(6) broadly to find that supervisors and co-workers can be liable pursuant to this section even if they do not have the ability to hire and fire employees, so long as they "actually participate[d] in the conduct giving rise to the discrimination."  *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004) (alteration omitted) (quoting *Tomka*, 66 F.3d at 1317); *see also Scalera*, 2012 WL 991835, at *14–15 (citations omitted) ("An individual can also be held liable under § 296(6) when he or she 'actually participates in the conduct giving rise to a discrimination claim.'").  Because the Court finds that the Sullivans are subject to liability as owners of Suffolk Laundry, the Court does not address EEOC's alternative argument.

that individuals may be held liable under § 296(1), and that the plain language of § 296 suggests

that it was not intended to create individual liability based on "ownership interest." The Court

rejects Defendants' argument.

In *Patrowich* the New York Court of Appeals held:

> A corporate employee, though he has a title as an officer and is the
> manager or supervisor of a corporate division, is not individually
> subject to suit with respect to discrimination based on age or sex
> under New York's Human Rights Law (Executive Law, art 15) or
> its Labor Law (§ 194) or under the Federal Age Discrimination in
> Employment Act [ADEA] (29 USC § 623) or Equal Pay Act
> [EPA] (29 USC § 206, subd [d]) *if he is not shown to have any
> ownership interest or any power to do more than carry out
> personnel decisions made by others*.

*Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 542 (1984) (emphasis added). This decision has been

widely cited and understood by both state and federal courts as standing for the proposition that

"individuals may be subject to liability as employers 'if they have ownership interests in the

[employing business] or do more than carry out personnel decisions of others.'" *Matusick*, 757

F.3d at 53 (alteration in original); *see also Townsend*, 679 F.3d at 57 ("[a]n individual qualifies

as an 'employer' when that individual has an ownership interest in the relevant organization or

the 'power to do more than carry out personnel decisions made by others.'" (quoting *Patrowich*,

63 N.Y.2d at 541)); *Barella v. Vill. of Freeport*, --- F. Supp. 2d ---, ---, 2014 WL 1672364, at *8

(E.D.N.Y. Apr. 26, 2014) ("The NYSHRL provides for individual liability, where a defendant

has 'an ownership interest,' or 'the authority to hire and fire employees,' under a theory of direct

liability" (internal quotation marks omitted) (citing N.Y. Exec. L. § 296(1) and *Edwards v.

Jericho Union Free Sch. Dist.*, 904 F.Supp.2d 294, 304 (E.D.N.Y. 2012)); *Ingenito v. Riri USA,

Inc.*, No. 11-CV-2569, 2013 WL 752201, at *14 (E.D.N.Y. Feb. 27, 2013) (same); *N.Y.S. Div. of

Human Rights v. ABS Elecs., Inc.*, 958 N.Y.S.2d 502, 504 (App. Div. 2013) ("An individual will

not be subject to liability under the Human Rights Law unless he or she is shown to have an

ownership interest or any power to do more than carry out personnel decisions made by others."), *leave to appeal denied*, 2014-670, 2014 WL 4357465 (N.Y. Sept. 4, 2014); *Murphy v. Kirkland*, 930 N.Y.S.2d 285, 287 (App. Div. 2011) (holding that president and sole shareholder of bank was "individually liable to the complainant [under the NYSHRL] based on his ownership interest in" the bank); *Eastport Assocs., Inc. v. N.Y.S. Div. of Human Rights*, 897 N.Y.S.2d 177, 180 (App. Div. 2010) (holding that co-owner and president of defendant business was "individually liable to the complainant based on his ownership interest in" the business); *State Div. of Human Rights v. Koch*, 875 N.Y.S.2d 180, 181 (App. Div. 2009) ("Koch, as owner and president of First Preferred, was individually liable for the discrimination" under the NYSHRL).

Defendants argue that the New York Court of Appeals in *Patrowich* was discussing four different statutes in this excerpted paragraph, and that there is reason to believe that the reference to "ownership interest" was intended to refer only to the last two referenced statutes — the ADEA and the EPA — and not to the NYSHRL. (Def. Mem. 69–70.) Defendants cite *Kaiser*, 899 N.Y.S.2d at 210, which criticized but complied with the "broad reading" of *Patrowich* as adopting the "economic realities" test[16] to determine who comprises an "employer" within the meaning of § 296(1).[17] Because Defendants' position is contrary to authority, the Court declines to adopt their reading of the NYSHRL.

_____

[16] The economic realities test "requires the plaintiff to put forth evidence that shows the corporate employee sued (i.e., the putative employer) has an [ ] ownership interest [in the company] or power to do more than carry out personnel decisions made by others." *Kaiser v. Raoul's Rest. Corp.*, 899 N.Y.S.2d 210, 211 (2010) (alteration in original) (internal quotation marks omitted) (quoting *Patrowich*, 63 N.Y.2d at 543).

[17] In *Kaiser* the court noted, in dicta, that "[a]lthough *Patrowich* holds that a necessary condition for an employee to be classified as an employer for purposes of the Human Rights Law

Defendants also assert a cursory argument that "the criterion of 'an ownership interest' [in NYSHRL § 296(1)] is unconstitutionally vague," and therefore "violates due process by failing to provide fair notice or warning when the state has prohibited specific behavior or acts." (*See* Def. Mem. 72 n.46 (citing *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) and *Smith v. Goguen*, 415 U.S. 566, 572 (1974)).) Defendants argue that "as it stands, the interpretation of ownership interest could be taken to mean that someone who owns even a single share of a public corporation could be personally liable as an employer under [NYSHRL] § 296(1)(a)," and that "the Legislature did not intend for that outcome." (*Id.*) Defendants' argument is without merit.

"[A] statutes language may be so vague as to deny due process of law . . . 'if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.'" *Thibodeau*, 486 F.3d at 65 (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). Before assessing whether a statute is void for vagueness on its face the Court must "examine the complainant's conduct before analyzing other hypothetical applications of the law." *Id.* at 67 (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)). As applied to the Sullivans here, there is no ambiguity as to what conduct is proscribed under the NYSHRL.

Defendants challenge the statute as unconstitutionally vague on its face because it could render unlawful the conduct of such a hypothetical individual who owns a single share of stock

---

is that the employee have an ownership interest in the company or the power to do more than carry out personnel decisions made by others, the Court did not hold that either condition was a sufficient condition." *Kaiser*, 899 N.Y.S.2d at 211. The *Kaiser* court noted that the Court of Appeals had not revisited *Patrowich* and held that, "Until the Court does, we think it appropriate to follow our precedents that adopt the broad reading of the holding of *Patrowich*." *Id.*

in a public corporation. *See Thibodeau*, 486 F.3d at 71 (2d Cir. 2007) ("A facial challenge is 'a

species of third party (*jus tertii*) standing' by which 'a party seeks to vindicate not only his own

rights, but those of others who may also be adversely impacted by the statute in question.'"

(quoting *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 144–45 (2d Cir. 2000))).

However, Defendants do not assert that the Sullivans are individuals who own "a single share of

a corporation" that is being subject to liability here. Because they do not have direct interest in

the theoretical application of the statute in this manner, Defendants lack standing to raise this

challenge. *See id.* ("[F]ederal courts as a general rule allow litigants to assert only their own

legal rights and interests, and not the legal rights and interests of third parties." (quoting *Farrell

v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006))).[18]

---

[18] Defendants' arguments that "a finding of liability under the Human Rights Law creates a constitutionally protected property interest," and that a finding of individual liability based solely on ownership interest in a defendant-company would comprise a due process violation are also without merit. (*See* Def. Mem. 71.) Defendants' rely on *Pan American World Airways, Inc. v. New York State Human Rights Appeal Bd.*, 61 N.Y.2d 542 (1984). Read in complete context, this provision of *Pan American* provides:

> The Human Rights Law provision that bases employer liability upon a finding of discrimination creates a constitutionally protected property interest. Consequently, a claim under this statute may not be finally dismissed consistent with due process unless an opportunity is granted for a hearing appropriate to the nature of the case.

*Pan Am. World Airways, Inc.*, 61 N.Y.2d at 548 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)). Thus, *Pan American* speaks to the constitutionally-protected property interest of a complainant who files a complaint of discrimination with the State Division of Human Rights; it does not suggest that the NYSHRL creates a constitutionally-protected property interest for a potential *defendant*. *See id.* (holding that "complainant's rights to due process were not violated by the Division's dismissal of their claims prior to a full evidentiary hearing on the merits."); *see also Logan*, 455 U.S. at 428 ("a [legal]cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause.").

To the extent that Defendants' additional argument that "finding an individual liable under Exec. Law § 296(1)(a) solely because of his or her ownership interest in the defendant-company therefore would constitute a due process violation," (Def. Mem. 71–72 (citing *Ives v. So. B. R. Co.*, 201 N.Y. 271 (1911))), is premised on the incorrect assumption that the NYSHRL

In sum, because they are co-owners of Suffolk Laundry with the authority to "do more than carry out personnel decisions made by others," the Sullivans are subject to individual liability under § 296(1).

## III. Conclusion

For the foregoing reasons, the Court denies Defendants' motion for partial summary judgment as to the hostile work environment claims. The Court will issue a separate ruling on Defendants' motion for summary judgment as to the retaliation claims.

SO ORDERED:

_____
s/MKB
MARGO K. BRODIE
United States District Judge

Dated: September 30, 2014
        Brooklyn, New York

---

has been found to create a constitutionally protected property right for business owners, the argument fails. Moreover, Defendants' reliance on the 103-year old *Ives* case is misplaced as cases subsequent to *Ives* have questioned its validity. *See Country-Wide Ins. Co. v. Harnett*, 426 F. Supp. 1030, 1034 (S.D.N.Y. 1977) ("*Ives* may no longer be the law of New York"), *aff'd*, 431 U.S. 934 (1977); *Bauman v. Town of Irondequoit*, 122 N.Y.S.2d 47, 52 (Sup. Ct. 1953) ("Subsequent to the decision of the Court of Appeals in *Ives* . . . the United States Supreme Court sustained the validity of the Arizona Employers' Liability Law holding that the States had a wide range of legislative discretion in enacting compensation laws notwithstanding the provisions of the Fourteenth Amendment . . . [which] rendered obsolete much that was said in [*Ives*] about the constitutionality of the Workmen's Compensation Law"), *aff'd*, 125 N.Y.S.2d 250 (App. Div. 1953); *Evans v. Berry*, 262 N.Y. 61, 69 (1933) (same).